Filed 11/21/14  P. v. Ramay CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F066099 |
| Plaintiff and Respondent,<br>v. | (Super. Ct. No. BF142052A ) |
| KENNETH FRANK RAMAY, JR., | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Cory J. Woodward, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Kenneth Frank Ramay, Jr., of inflicting corporal injury on a cohabitant (Pen. Code,[1] § 273.5, subd. (a)), assault with intent to commit sodomy (§§ 220, 286), and false imprisonment with violence (§ 236) based on an incident involving his girlfriend, Lori.[2] Ramay entered a guilty plea to four misdemeanor counts of annoying or molesting a child under the age of 18 (§ 647.6) after the jury was unable to reach a verdict on more serious charges of child sexual abuse involving L., the daughter of Ramay's ex-wife, S. The trial court sentenced Ramay to prison for a total of six years. Ramay's sole contention on appeal is that the court erred in admitting evidence of his prior acts of domestic violence against S. and her daughter, C., to show his propensity to commit domestic violence. We disagree and affirm the judgment.

## *FACTS*[3]

The offenses involving Lori arose from an incident that occurred on December 8, 2011. At that time, she and Ramay had been living together for about a year and a half. According to Lori, their relationship was great at first. After a few months, however, Ramay became jealous, controlling, and verbally abusive. He would accuse her of seeing other people and sometimes would want to see her phone to look through it for information.

On the morning of December 8, 2011, Lori was seated at the computer table, preparing to send out Christmas cards for Ramay's tree service business, when she told Ramay they needed stamps. After Ramay left to buy stamps, Lori went on the computer to get addresses for the cards. When Ramay returned, he accused Lori of cheating on him

---

**1** Further statutory references are to the Penal Code unless otherwise specified.

**2** In this opinion, certain persons are identified by their given names in accordance with our Supreme Court's policy regarding protective nondisclosure. No disrespect is intended by using the familiar form of address.

**3** Since Ramay does not challenge the sufficiency of the evidence and no error requiring a prejudice analysis appears, detailed recitation of trial testimony is unnecessary.

2

again and of being on the Internet with her boyfriend. He told Lori he needed to see her phone.

As he was confronting her, Lori noticed Ramay had an expression of disgust and rage on his face she had never before seen. Lori slammed the keyboard back into the computer and told Ramay this was unacceptable and she was not going to take this. The next thing Lori remembered was Ramay lifting her up off her feet by her throat. He was using obscenities and told her she owed him "a butt fucking." Lori described Ramay's predilection for anal sex and how, prior to the subject incident, he "badgered [her] constantly" about it, although she had tried it once with him, hated it, and told him she did not want it.

Ramay next tried to move Lori into the bedroom. Fearing her life would be in danger if he succeeded, she clawed against the doorframe with her hands and feet, resulting in damage to the doorframe and injury to her hands. Ramay eventually overpowered Lori. With his hands holding her neck, he shoved her face down on the bed. Lori could "[b]arely" breathe and thought she might have lost consciousness for a period of time.

Ramay tried to remove Lori's pants while he was holding her down on the bed but was unsuccessful because he was unable to hold her down and unbutton her pants at the same time. When he would let go of her neck to try to unbutton her pants, she would struggle more to get up. She would also try to talk to him, telling him if he let her get up, she would do whatever he wanted, but it did not have to be violent.

Ramay finally let go of Lori and told her to run away from him and never come back. Lori tried to calm Ramay and advised him to seek help from his counselor. Ramay left in his jeep and Lori went and stood in the street until a neighbor came out and took Lori inside the neighbor's house.

Detective Enrique Bravo soon arrived and Lori went outside to speak with him. Before Bravo could speak with Lori, however, Ramay pulled up in his Jeep and started screaming at them and saying Lori could tell the truth. Ramay looked very agitated as he started walking towards them. Bravo directed Ramay to take a step back and then asked what was going on. Ramay responded, "I was a little bit out of control. I put hands on her."

After detaining Ramay, Bravo spoke with Lori about what happened. Her account was largely consistent with her trial testimony, except she told Bravo she did not think she passed out while being held down on the bed. Lori also reported that Ramay told her she owed him "an ass fucking or money" before he picked her up and tried to take her into the bedroom.

Bravo observed that Lori had redness around her neck, a scratch on her elbow, and an injury on her hand. Lori told him the injury occurred when she was trying to hold onto the doorframe. Lori also had spots on her eye, reflecting a condition known as petechia, which can be caused by choking or strangling.

### Prior Incidents of Domestic Violence

Ramay's ex-wife, S., testified that she met Ramay in 1999, and he moved in with her sometime during the winter months. Their relationship was good for a while, but then he started calling her offensive names.

The first incident of domestic violence S. recalled in her testimony involved a game of horseshoes with Ramay. Ramay said "let's bet your ass." S. thought he was being playful and said "okay, fine." After she lost the game to him, they went into the bedroom and she thought they were going to have regular sex. Instead, Ramay grabbed her and pushed her face down on the bed where she could "barely breathe." He then pulled her pants down and "raped [her] anally." When Ramay finished, he told S. that was what she would get for betting him. According to S., Ramay had an "infatuation"

4

with anal sex and would always tease her about it. She tried to have anal sex with him once before the horseshoes incident. It hurt and he stopped when she asked him to.

In a second incident, while they were arguing, Ramay grabbed S.'s throat and pulled her to the ground. He then pushed her off the porch and came towards her with a brick in his hand saying he was going to "smash [her] head in." S. recalled this incident resulted in Ramay going to jail for almost a year and then spending another year in "rehab" at a facility called Tabitha House. The parties later stipulated that Ramay was convicted of spousal abuse on November 20, 2002.

During a third incident, S. took Ramay's keys because he was threatening to drive off with their son. The keys were in S.'s purse and her daughter, C., was holding the purse. Ramay tried to get the purse and then grabbed C.'s throat and started squeezing it.

S. testified that after Ramay returned home from Tabitha House, his abuse went from being "less physical to all pretty much verbal." Ramay continued to call her offensive names and place her in "submission holds," which she described as "putting your arm around a person's neck and holding them so that they can't move and grabbing their arm and yanking it behind [their] back." S. testified that Ramay would place her in submission holds "[a]t the drop of a hat" and at various times, including both when he was angry and when he thought it was funny. S. further testified: "The biggest thing that he liked to do is push me on the couch and hold me down and say … 'you are not going anywhere, I've got control of you. You are not going anywhere.'"

Ramay and S. separated in August 2010, after S. obtained a restraining order against him following a physical altercation between Ramay and one of her sons.

### DISCUSSION

Ramay contends the trial court erred in admitting evidence of his prior acts of domestic violence against S. and C. under Evidence Code section 1109 to show his propensity to commit domestic violence. Relying heavily on the incident of forcible

5

sodomy described in S.'s testimony, Ramay contends the court abused its discretion in admitting the prior domestic violence evidence under Evidence Code section 352 because the evidence was more prejudicial than probative, was remote, and posed a substantial danger of confusing the jury by tempting it to convict him of the charged offenses involving Lori simply to punish him for the forcible sodomy of S., for which he had never been punished.

Evidence Code section 1109 provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence" within the prior 10 years is admissible, unless it is deemed more prejudicial than probative under Evidence Code section 352. (Evid. Code, § 1109, subds. (a)(1), (e).) Evidence of acts of domestic violence occurring more than 10 years before the charged offense may be admitted if "the court determines that the admission of this evidence is in the interest of justice." (*Id.,* subd. (e).)

Under Evidence Code section 352, evidence is properly excluded if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code]

6

section 352, "prejudicial" is not synonymous with "damaging.'" [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

"The admissibility of evidence of domestic violence is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion. [Citations.]" (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.)

Based on our review, we conclude the trial court did not abuse its discretion in admitting the evidence of Ramay's prior acts of domestic violence against S. and C. The evidence was highly probative as it tended to show Ramay's propensity to resort to violence, especially when angered, as a means of exercising control over his intimate partners, including through others, as in the case of C., whom Ramay attacked in S.'s presence during a dispute that started between him and S.[4]

None of the prior acts was likely to invoke the kind of prejudice Evidence Code section 352 was designed to prevent, including the incident of forcible sodomy involving S. This incident was not, as Ramay suggests, significantly more egregious than the charged offenses, notwithstanding the fact he failed to carry out his apparent intent to commit sodomy on Lori. Ramay's conduct towards Lori, which included lifting her up off her feet by her neck, was still extremely coercive and violent. The incident was also remarkably similar to the prior incident involving S. In both incidents, Ramay violently pushed the victims face down on the bed, impeding their ability to breathe, before

---

[4]    Ramay does not dispute that his prior acts against Christine qualified as acts of domestic violence within the meaning of Evidence Code section 1109, even though Christine was not an intimate partner of his. (See Pen. Code § 13700, subd. (b) [defining "domestic violence" as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship"].) The court properly admitted evidence of the incident involving Christine under Evidence Code section 1109 because the relevant statute defining "domestic violence" also defines "abuse" to include "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, *or another*." (Pen. Code § 13700, subd. (a), italics added.)

attempting to remove their pants (successfully in S.'s case). He also made vulgar comments to both victims expressing an attitude of entitlement to anal sex, notwithstanding the victims' previous professions of dislike for the act. The similarities between the two incidents lessened the potential prejudice and enhanced the probative value of the prior domestic violence evidence.

Furthermore, the evidence was not likely to confuse the issues or mislead the jury as the incident involving Lori was relatively recent in relation to the prior acts involving S. and C. We see no support in the record for Ramay's theory of jury confusion, which argues the Evidence Code section 1109 evidence posed an intolerable risk the jury would be tempted to convict him of the charged crimes simply to punish him for his prior act of forcible sodomy against S. The jury here was instructed that, if it concluded Ramay committed the uncharged acts of domestic violence, this was not sufficient by itself to prove he was guilty of any of the charges involving Lori, but the People were still required to prove each charge beyond a reasonable doubt. (CALCRIM No. 852.) Juries are presumed to follow the trial court's instructions, unless the record affirmatively indicates otherwise. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83.)

Ramay's comparison of the situation here to that in *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*) is inapt. *Harris* was a case in which the defendant, a mental health nurse who worked at a mental health treatment center, was convicted of several sex offenses after he had been accused of preying on women who were vulnerable due to their mental health condition. (*Harris*, at pp. 730-731.) The *Harris* court found an abuse of discretion in admitting evidence under Evidence Code section 1108. However, the facts in *Harris* were entirely different from those here. In *Harris*, the prior offense was forcible and the evidence of it was "inflammatory *in the extreme*." (*Harris,* at p. 738.)[5]

_____

[5]    According to the *Harris* court, "the evidence of the 1972 incident described a viciously beaten and bloody victim who as far as the jury knew was a stranger to the defendant. The defendant's role in the attack and his subsequent conviction for burglary, while apparently

8

The charged sexual offenses were, by contrast, not forcible but involved breaches of trust. Thus, the charged offenses were "of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury." (*Harris,* at p. 738.) Moreover, "[t]he facts of the prior conduct were redacted to a point that the jury must have come away with a misleading impression of what happened." (*Id.* at p. 733.) The prior offense occurred 23 years before the charged offenses, a factor the Court of Appeal found weighed in favor of exclusion. (*Id.* at p. 739.)

The circumstances found in *Harris* do not exist here. Ramay's prior acts of domestic violence in this case were similar in nature to the charged offenses and none of the prior acts could be said to be "inflammatory *in the extreme*." (*Harris*, *supra*, 60 Cal.App.4th at p. 738.) In this regard, we are not persuaded by Ramay's assertions that the evidence he threatened to smash S.'s head in with a brick, because it evinced an intent to kill, was more egregious than the evidence of the current offenses involving domestic violence towards Lori. Finally, in terms of remoteness, the uncharged acts of domestic violence in this case were relatively recent in contrast with the 23-year-old offense in *Harris*.

We also reject Ramay's claim that the prior acts of domestic violence had minimal probative value in light of S.'s testimony that, following his release from Tabitha House, his abuse of her was primarily verbal, rather than physical, in nature. The fact Ramay refrained from committing more aggravated acts of violence against S. in the years following his 2002 conviction of spousal abuse (and their enforced separation during the time he spent in jail and in a rehabilitation facility) does not demonstrate he led a substantially blameless life between 2002 and the time of the charged offenses as Ramay asserts. After he returned home from Tabitha House, Ramay continued to subject S. to

violent and sexual, is unexplained. The jury is simply told that defendant was convicted of burglary with the infliction of great bodily injury." (*Harris*, *supra*, 60 Cal.App.4th at p. 738.)

verbal abuse and unwanted acts of physical domination and control. On this record, the trial court could reasonably conclude the challenged acts of domestic violence committed by Ramay early in his relationship with his ex-wife were not an aberration but part of an overall pattern of abuse in a relationship that lasted until 2010, and therefore the evidence retained its high probative value in relation to the crimes of domestic violence he was charged with committing against his new partner in 2011.

Nor has Ramay established error by pointing out that the prosecutor failed to establish the incident of forcible sodomy against S. occurred within the 10-year timeframe contained in Evidence Code section 1109. During the in limine hearing on the admissibility of the evidence, the prosecutor acknowledged the lack of evidence establishing a date for the incident and that it could have occurred slightly outside the 10-year timeframe. The prosecutor urged the court to admit the evidence "in the interest of justice," arguing "it's highly relevant when a batterer abuses his intimate partner and then he does it again to another intimate partner." It was the court's prerogative to admit evidence of acts occurring more than 10 years prior to the charged offenses based on its implicit determination that doing so would serve the interest of justice. (Evid. Code, § 1109, subd. (e).) Ramay has not shown the trial court abused its discretion in making this determination or rejecting his arguments under Evidence Code section 352.

As a corollary claim, Ramay argues the admission of propensity evidence under Evidence Code section 1109 violates due process and that the statute is unconstitutional, both facially and as applied. He acknowledges that courts have consistently upheld Evidence Code section 1109 against claims that it is unconstitutional. (See, e.g., *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704 [statute satisfies due process]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309-1313 [statute satisfies equal protection]; *People v. Falsetta* (1999) 21 Cal.4th 903, 917 [Evidence Code section 1108, which allows evidence of prior sex offenses to be used as propensity evidence in sex crime

cases, comports with due process].)  For the reasons explained in these cases, we reject Ramay's constitutional challenges to Evidence Code section 1109.  The admission of the propensity evidence in this case did not render Ramay's trial fundamentally unfair.

### *DISPOSITION*

The judgment is affirmed.


_____
HILL, P. J.

WE CONCUR:


_____
CORNELL, J.


_____
GOMES, J.

11